THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DR. WEN-TING ZHENG-SMITH,

                                        Plaintiff,

     -against-

NASSAU COUNTY, NASSAU HEALTH CARE CORPORATION
d/b/a  NUHEALTH SYSTEM, , DR. VICTOR POLITI and
DR. JOHN RIGGS, Individually.,

                                        Defendants.
-----------------------------------------------------------X

Plaintiff, Dr. Wen-Ting Zheng-Smith ("Plaintiff") through her counsel, Jonathan Tand &

Associates, P.C. , hereby submits this Complaint and complains of the Defendants, upon

information and belief, as follows:


## NATURE OF CASE

1.  Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42

    U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991,

    Pub. L. No. 102-166 ("Title VII"), 42 U.S.C. § 1981, New York State Human Rights Law,

    and seeks damages to redress the injuries Plaintiff suffered as a result of being exposed to

    race discrimination, national origin discrimination, harassment, hostile work environment,

    retaliation, and wrongful termination

2.  Jurisdiction of this action is conferred upon this Court as this action involves a federal

    question under Title VII of the Civil Rights Act. The Court also has supplemental

    jurisdiction over the State causes of action.

3.  Venue is proper in this District based upon Defendants' residency and place of business within Nassau County, State of New York, within the Eastern District of New York. 28 U.S.C. §1391(b).

4.  On or around November 1, 2017, Plaintiff filed charges with the EEOC against Defendants as set forth herein.

5.  On or around January 10, 2018, Plaintiff filed additional charges against Defendants with the EEOC.

6.  On or around January 26, 2018, the Equal Employment Opportunity Commission mailed a Right to Sue Letter to Plaintiff.

7.  Plaintiff received the Right to Sue Letter on February 1, 2018.

8.  Plaintiff spoke with EEOC representative Ms. Mabel Tso to discuss her receipt of the Right to Sue Letter on February 1, 2018.

9.  Plaintiff filed a Notice of Claim with Nassau County on or around March 27, 2018.

10. Plaintiff's Notice of Claim was received by the County Attorney's Office on March 29, 2018.

11. Plaintiff's attorney filed a Notice of Claim on or around April 4, 2018.

12. The Nassau County Attorney's Office received that Notice of Claim on April 9, 2018.

13. Plaintiff satisfied all administrative prerequisites and is filing this case within ninety (90) days of receiving the Right to Sue Letter.

## PARTIES

14. Dr. Zheng-Smith is an Asian American female who currently resides in Nassau County.

15. Defendant Nassau County (Hereinafter referred to as "Defendant" or "Defendants") is a municipal corporation, duly organized and existing under, and by virtue, of the Laws of the State of New York.

16. At all relevant times, Plaintiff was an employee of Nassau County.

17. Defendant Nassau Healthcare Corporation d/b/a NUHealth System (Hereinafter referred to as "Defendant" or "Defendants") operates as a healthcare organization that provides essential medical care, disease, and lifestyle management services.

18. The Nassau Health Corporation was created by an act of the New York State Legislature effective February 6, 1997.

19. Pursuant to Public Authorities Law §3401 (2), the Corporation "is a state, county and public purpose" whose "powers and duties constitutes the performance of essential public and governmental functions."

20. Plaintiff at all relevant times was an employee of Nassau Healthcare Corporation.

21. Dr. Victor Politi (Hereinafter referred to as "Defendant" or "Defendants") has been Chief Executive Officer and President at Nassau University Medical Center since February 8, 2014. Dr. Politi serves as Chief Executive Officer and President of Nassau Health Care Corporation.

22. At all times relevant, Dr. Politi was the CEO of Nassau Healthcare Corporation.

23. Dr. John Riggs (Hereinafter referred to as "Defendant" or "Defendants") as chairman of the Department of Obstetrics and Gynecology (OB/GYN) at the Nassau University Medical Center ("NUMC").

24. At all relevant times, Dr. Riggs was Plaintiff's supervisor.

## FACTS

25. Dr. Zheng was a practicing OB/GYN physician in China prior to immigration to the United States of America ("U.S.").

26. In June 2015, Dr. Zheng acquired her OB GYN 1st year residency (PGY-1) training credit from Jamaica Hospital Medical Center, and then transferred to NUMC as an OB/GYN 2nd year resident (PGY-2) in July of 2015, which is closer to her home.

27. At all relevant times, Dr. Zheng worked at NUMC as a resident.

28. At this time, the chairman was Dr. Chaur-Dong Hsu ("Dr. Hsu") who was also a doctor in China.  However, Dr. Zheng neither knew nor met Dr. Hsu before her interview for this PGY-2 job at NUMC.

29. During the seven (7) month period when Dr. Hsu was still working in NUMC, Dr. Zheng had no issues.

30. In September 2015, Dr. Hsu was asked by NUMC to resign from his OB GYN Chairman position as due to alleged "communication and leadership incompetency", then was replaced by Dr. John Riggs ("Dr. Riggs") in January 2016 as the chairman of the OB/GYN department.

31. In the fifteen (15) months following Dr. Riggs appointment as the chairman of the OB/GYN department, Dr. Riggs practiced blatant nationality and race discrimination against Dr. Zheng.

32. For example, Defendant Riggs mocked Plaintiff's accent in public, excessively scrutinized her, defamed her work, and provided false accusation of medical malpractice, retaliation, denied a promotion, demoted her and assisted in her wrongful termination.

33. NUMC OB GYN Residency Program is an Accreditation Council for Graduate Medical Education (ACGME) credited training program.

34. Dr. Zheng earned satisfactory ACGME six Core Competencies evaluations by direct supervising doctors in each training rotation, however Dr. Zheng was issued five (5) remediation/probations during the fifteen (15) months following Dr. Riggs appointment as the chairman of the OB/GYN department.

35. Dr. Riggs routinely harassed Dr. Zheng by mocking her accent and speech in public.

36. Dr. Zheng speaks clear English and works very hard to make her speech comprehensible.

37. Dr. Riggs impersonated the accent of native Chinese speaker in order to humiliate Plaintiff.

38. During the time from July 1 to September 30, 2016, Dr. Zheng worked about one afternoon per week with Dr. Riggs in outpatient clinic office.

39. Dr. Riggs routinely questioned what word Dr. Zheng meant to say, although other medical staff do not have such issue. For example:

40. On or about July 13, 2016, Dr. Riggs requested Dr. Zheng's mentor Dr. Lennox Bryson ("Dr. Bryson") (Dr. Bryson does not speak Chinese) to "translate" Dr. Zheng's English with Chinese accent to native English while presenting cases.

41. On or about August 10, 2016, in clinic office, Dr. Riggs requested Dr. Bryson to help him understand what Dr. Zheng meant about the patient as he could not understand her English with Chinese accent.

42. Plaintiff complained to Dr. Hong regarding Dr. Riggs discrimination.

43. On or about November 17, 2016, in NUMC OB GYN departmental meeting, Dr. Zheng complained that she is a small immigrated Chinese woman who was an easy target to be picked on by prejudice people, although the percentage of prejudice people is small.

44. Dr. Zheng's mentor Dr. Bryson encouraged Dr. Zheng to discuss nonresolvable departmental issues with NUMC Academic Affairs, Dean and Designated Institutional Official, Robert M. Yost ("Mr. Yost").

45. During Dr. Zheng's rotation in inpatient Service, Dr. Riggs routinely complained of her accent at TEAM STEPPS meetings.

46. In an act of retaliation, Defendant Politi canceled Plaintiff's residency research project on January 5, 2017.

47. On or about January 6, 2017, at TEAM STEPPS meeting, Dr. Riggs ridiculed and mocked Dr. Zheng's accent and voice.

48. Dr. Zheng complained to supervising Attending Doctor Dr. Hong.

49. Dr. Hong commented that Dr. Santana complained to him that what Dr. Riggs was doing to Dr. Zheng "was just too much".

50. On or about February 16, 2107, at TEAM STEPPS meeting, Dr. Riggs complained that Dr. Zheng was speaking too fast with Chinese accent for which he could not understand, in addition her presentation needed to be more in details. The presentation lasted 45 minutes which was twice the time as usual while Dr. Zheng was requested to present repetitively to make her speech "clear". Following medical staff witnessed it: Dr. Maggie Tetrokalashvili ("Dr. Tetrokalashvili"), Dr. Emma Hacket, Dr. Svetlana Chirokikh, Pediatricians, anesthesia Attending Doctors, Medical Residents, Nurses and Medical Students. Dr. Zheng complained it to her Mentor Dr. Bryson. Dr. Bryson stated that Dr. Zheng's accent is not a problem. Dr. Bryson advised Dr. Zheng to speak slowly going forward.

51. On or about February 17, 2107, at TEAM STEPPS meeting, Dr. Riggs stopped Dr. Zheng's presentation after two (2) minutes with complaints that she was speaking too slow and

giving out too much details for which "the STEAM STEPPS will last forever". Then Dr. Riggs abandoned the meeting quickly in about three (3) minutes. The following medical staff witnessed it: Dr. Tetrokalashvili, Dr. Emma Hacket, Dr. Svetlana Chirokikh, Pediatricians, anesthesia Attending Doctors, Medical Residents, Nurses and Medical Students.

52. On or about April 5, 11, 20, 2018 Dr. Riggs needed native English-speaking Attending Doctors Dr. Bryson and Dr. Marilyn Robertson ("Dr. Robertson") – neither is Chinese speakers, to "translate" some of Dr. Zheng's presenting words during TEAM STEPPS.

53. Dr. Zheng was excluded from NUMC hospital and departmental social imaging, other than a public photo indicating that she was demoted to PGY-3 status that was posted on NUMC's website.

54. Defendants demoted Dr. Zheng from leadership training while her co-residents in the same class were allowed to as formal part of residency training in the last four（4）months of PGY-3.

55. In addition, after her demotion to PGY-3, other newly promoted PGY-3 residents were assigned to give Dr. Zheng instructions and to lead her even though she finished her PGY-3 training one year ahead of them.

56. Dr. Zheng was singled out from resident rotation preventing her from engaging in routine surgical training.

57. For example, her South Side Hospital surgical rotation has not evaluation provided due to Dr. Riggs prohibited her from attending this rotation in full.  Dr. Riggs limited her rotation by nine (9) weeks, allowing her to attend for only four (4) weeks. Instead, Dr. Zheng was

assigned to outpatient clinic office excessively without practicing surgical skills or being trained.

58. Defendants kept Dr. Zheng from engaging in specialty clinics, as other senior residents are regularly allowed.  Instead, Dr. Zheng was regularly relegated to general OB/GYN clinics to share the same duties with junior interns and junior residents. In addition, Dr. Zheng was frequently assigned to the intern's office to see patients in the clinic while interns or junior residents were assigned to perform tasks that would normally be assigned to senior residents.

59. On or about November 15, 2016, Dr. Zheng delivered a patient's newborn baby along with Dr. Robertson.  The nurse on duty during the birth was Nurse Doreen Cooney ("Ms. Cooney").

60. The following day, November 16, 2016, Dr. Riggs informed Dr. Zheng that Ms. Cooney accused her of failing to cut the new born baby's umbilical cord between two yellow clamps, as is proper procedure, so that Ms. Cooney had to put a clear clamp on the baby's cord at the delivery.

61. Dr. Zheng attempted to explain that she followed proper procedures to Dr. Riggs and the Residency Program Director, Dr. Tetrokalashvili, to no avail.

62. As part of the retaliation, Dr. Riggs repeatedly emphasized in meetings and documents that Dr. Zheng has "helpless poor judgement issue", "uncorrectable insubordinate behavior", "never listens to advice" and "never follows instructions", so that Dr. Zheng was "incompetent" and "dangerous for the patients' safety", who "cannot be trusted, ever".

63. Furthermore, on January 6, 2017, Defendants placed Plaintiff on institutional probation for falsely accused malpractice.

64. In addition, NUMC issued Dr. Zheng a 2nd Institutional Probation on National Doctor's Day on or about March 30, 2017, at the noon, while NUMC's Doctors, Medical Residents and Medical Students were celebrating the event with luncheon and having public photos taken.

65. On or about September 20, 2017, Dr. Riggs threatened Dr. Zheng by stating that her institutional probation will be prolonged for one more year without promotion to PGY-4, and Dr. Riggs also threatened her by stating that he was going to report Zheng's "incompetency" again and decision of prolonged her PGY-3 for one more year to ACGME on that day.

66. Defendants discriminated against Dr. Zheng by not following the ACGME guidelines.

67. By alleging that Dr. Zheng had "leadership and surgical skills incompetency", Defendants placed her on probation for it, then took away opportunities from her leadership and surgical training is not only against ACGME guideline and policy, but also a reckless act of discrimination.

68. In a clear sign of disparate treatment, Defendants chose not to remediate/probate non-Chinese Residents who underperformed.

69. Several Residents in the same program as Dr. Zheng scored less than the twenty-fifth percentile (25%) in Council on Resident Education in Obstetrics and Gynecology ("CREOG") exam in January 2017.  Pursuant to Defendants' policy, these Residents should have been placed on academic remediation, however, they were excused.

70. Dr. Zheng held the best CREOG score among Residents in the NUMC OB/GYN program and had maintained the best CREOG scores in her class three (3) years in a row.

71. Defendants failed to remove Dr. Zheng's remediation after successful completion, by against NUMC Medical Staff/Academic Affairs Policy/Procedure.

72. Defendants treated Dr. Zheng unlawfully by not removing all mention of remediation from her academic record. Section 2.1.7 of the Medical Staff/Academic Affairs Policy/Procedure states that:

> "Upon satisfactory completion of the departmental remediation and the return of the resident to normal academic status, all mention of this temporary status will be removed from the resident's official departmental and Academic Affairs records.  Remediation periods will be considered to be part of the resident's individualized Education Plan, not part of formal academic discipline."

73. On or about February 22, 2017 Dr. Zheng met Mr. Yost to complain about unfair treatment that Defendants subjected her to as an OB GYN Resident.

74. Mr. Yost informed Dr. Zheng that he kept a statement from Dr. Santana to dispute the inappropriate actions putting Dr. Zheng on departmental and institutional probation.

75. On or about March 31, 2017 Dr. Zheng met Mr. Yost to complain about the continuing unfair treatments that she has been subjected to by OB GYN department.

76. The situation was so interrogable that Dr. Zheng requested a transfer on multiple occasions.

77. On or about April 11, 2017, May 25, 2017 and July 20, 2017, Dr. Zheng requested NUMC OB GYN residency program to provide her Residency training certification to look for another Residency position elsewhere.

78. Defendants ignored her requests to be moved.

79. Mr. Yost stated that both NUMC institutional probations that Dr. Zheng has been put on will be removed after her graduation. However, it was getting worse after making complaints of discrimination and unlawful behavior to the administration.

80. On or about May 30, 2017, Dr. Zheng met Mr. Yost to complain about the worsening unfair treatment by OB GYN department, when Mr. Yost stated that he was going to follow up to make sure things are on the right track.

81. On and about September 22, 2017, Dr. Zheng called Mr. Yost's office via mobile phone regarding Dr. Riggs 's retaliation against her.

82. On or about September 26, 2017, Plaintiff emailed Defendants to request them to remove her wrongful institutional probation status.

83. Defendants ignored her request.

84. On or about September 29, 2017, Dr. Zheng, by and through her former counsel, forwarded Defendants a demand letter via Federal Express Overnight Mail and via e-mail.

85. The demand letter addressed the retaliation, discrimination and ongoing harassment that Dr. Zheng has been subjected to while employed with Defendants and requested that Defendants contact her counsel's office within ten (10) days of said notice.

86. In response, Dr. Zheng was further retaliated against, discriminated against and subjected to further harassment and a hostile work environment.

87. In October 2017, four (4) days after law firm Wong & Wong associates forwarded NUMC correspondence regarding Dr. Zheng's complaints of ongoing harassment, retaliation and discrimination, she was further retaliated against, and was suspended and terminated from her residency job at NUMC.

88. On October 5, 2017, Dr. Zheng forwarded a Notice of Appeal to the CEO of the Medical Center, Dr. Politi, pursuant to section 2.2.10 of the Medical Staff/Academic Affairs Policy/Procedure.

89. Although, Dr. Zheng followed proper procedure regarding her appeal and was given a date and time certain for an appeal meeting pursuant to section 2.2.10 of the Medical Staff/Academic Affairs Policy/Procedure, Dr. Zheng received e-mail correspondence from Dr. Riggs which was accompanied by a Notice of Termination as an attachment on October 12, 2017.

90. Dr. Riggs and all other individuals involved in Dr. Zheng's termination failed to follow NUMC's administrative procedure and further retaliated, harassed and discriminated against Dr. Zheng by terminating her prior to the previously scheduled appeal meeting with Mr. Yost and Dr. Politi.

91. Although Dr. Zheng received said Notice of Termination, she was advised by Mr. Yost to still attend the scheduled meeting set for October 13, 2017.

92. At the outset of the aforementioned meeting Dr. Zheng was advised that she would receive a decision regarding the appeal of her suspension within ten (10) days.

93. Additionally, on October 13, 2017, Dr. Zheng forwarded a Notice of Appeal to the CEO of the Medical Center, Dr. Politi, pursuant to section 2.2.10 of the Medical Staff/Academic Affairs Policy/Procedure in order to preserve her right to appeal the Notice of Termination, if necessary.

94. On October 23, 2017, Dr. Zheng received correspondence from counsel for NUMC, Rachel Demarest Gold, Esq. (Ms. Gold), indicating that Dr. Zheng's request for an appeal of her suspension and termination were reviewed by the President of NUMC and were denied.

95. Dr. Zheng subsequently requested a formal hearing pursuant to Defendants' Medical Staff/Academic Affairs Policy/Procedure.

96. Dr. Zheng attended a scheduled hearing on December 1, 2017, along with co-counsel, Thomas M. Gallo, Esq. ("Mr. Gallo").

97. Dr. Riggs appeared as a witness on his own behalf, and Dr. Tetrokalashvili, Dr. Robertson and Dr. Bryson also appeared as witnesses on behalf of Dr. Riggs.  The hearing lasted for a few hours, and at the outset of the hearing, the committee advised Dr. Zheng and Mr. Gallo that no conclusion would be drawn since Dr. Zheng did not bring any witnesses.

98. Dr. Zheng was then advised by the committee to bring witnesses for a hearing to be scheduled sometime in January 2018.  The hearing was scheduled by Ms. Gold on January 29, 2018 when Dr. Zheng's witnesses could not attend.

99. Dr. Zheng was therefore prevented from submitting evidence to support her claim to the hearing committee.

100.    On January 19, 2018, Dr. Zheng received an e-mail from Mr. Yost, which was accompanied by correspondence stating that the committee decided to uphold the termination of Dr. Zheng's Residency at NUMC.

101.    Defendants' actions and conduct were intentional and intended to harm Plaintiff.

102.    No reasonable person in Plaintiff's shoes should be expected to work under such harassing and retaliatory conditions.

103.    Plaintiff feels emotionally overwhelmed, depressed, anxious and distraught which is due to the condescending, hostile and general unprofessional treatment that she received from her supervisors as a result of retaliation for the complaint made regarding illegal discriminatory conduct.

104.    As a result of Defendants' discriminatory and intolerable treatment of Plaintiff, Plaintiff suffered and continues to suffer severe emotional distress.

105.     Plaintiff is experiencing severe anxiety and depression due to the discriminatory, unprofessional, degrading, condescending and hostile treatment towards Plaintiff by Defendants.

106.     Defendants' actions were and are intended to create a hostile working environment that no reasonable person would tolerate.

107.     It is clear that Defendants have a pattern and practice of discrimination.

108.     As Defendants conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages as against Defendant. Plaintiff seeks reinstatement, back pay, front pay, all lost wages and earning capacity, punitive damages, damages for emotional distress, physical injuries, medical expenses and attorney's fees.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
### (not against any individual Defendant)

109.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

110.     Title VII states in relevant part as follows: SEC. 2000e-2. [Section 703] (a) Employer practices, It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . .

111.     DEFENDANTS engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by allowing race and national origin discrimination, and causing a hostile work environment.

### AS A SECOND CAUSE OF ACTION
### FOR DISCRIMINATION UNDER TITLE VII
(not against any individual Defendant)

112.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

113.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a)

provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any

practice made an unlawful employment practice by this subchapter, or because [s]he has

made a charge, testified, assisted or participated in any manner in an investigation,

proceeding, or hearing under this subchapter."

114.     DEFENDANTS engaged in unlawful employment practice prohibited by 42 U.S.C.

§2000e et seq. by retaliating against Plaintiff with respect to the terms, conditions or

privileges of employment because of their opposition to the unlawful employment practices

of DEFENDANTS.

### AS A THIRD CAUSE OF ACTION
### FOR DISCRIMINATION UNDER NEW YORK STATE LAW

115.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

116.     New York State Executive Law §296(6) provides that it shall be an unlawful

discriminatory practice:

117.     "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden

under this article, or attempt to do so."

118.     DEFENDANTS engaged in an unlawful discriminatory practice in violation of

New York State Executive Law §296(6) by aiding and abetting, inciting, compelling and

coercing the discriminatory conduct.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER NEW YORK STATE LAW

119.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

120.     New York State Executive Law §296(7) provides that it shall be an unlawful

discriminatory practice: "For any person engaged in any activity to which this section

applies to retaliate or discriminate against any person because [s]he has opposed any

practices forbidden under this article."

121.     DEFENDANTS engaged in an unlawful discriminatory practice by wrongfully

retaliating against Plaintiff.

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER NEW YORK STATE LAW

122.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

123.     Executive Law § 296 provides that "1. It shall be an unlawful discriminatory

practice: "(a) For an employer or licensing agency, because of the age, race, creed, color,

national origin, sex, or disability, or marital status of any individual, to refuse to hire or

employ or to bar or to discharge from employment such individual or to discriminate

against such individual in compensation or in terms, conditions or privileges of employment."

124.     DEFENDANTS engaged in an unlawful discriminatory practice by discriminating against the Plaintiff through national origin, race discrimination, harassment, and causing a hostile work environment.

125.     Plaintiff hereby makes a claim against DEFENDANTS under all of the applicable paragraphs of Executive Law Section 296.

## AS A SIXTH CAUSE OF ACTION
## DISCRIMINATION AND RETALIATION IN VIOLATION OF
## 42 U.S.C. § 1981

126.     Plaintiff repeats and realleges by this reference the allegations set forth in the above paragraphs of this complaint.

127.     Section 1981 states as follows, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

128.     The section further states that "For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

129.     Defendants' discrimination against Plaintiff is in violation of the rights of Plaintiff as afforded to her by the Civil Right Act of 1866, 42 U.S.C. 1981.

130.     By the conduct described above, Defendants intentionally deprived the Plaintiff an

Asian American of the same rights as are enjoyed by United States citizens to the creation,

performance, enjoyment, and all benefits and privileges of her contractual employment

relationship with Defendants.

131.     As a result of Defendants' discrimination in violation of Section 1981, Plaintiff

have been denied employment opportunities providing substantial compensation and

benefits, thereby entitling her to injunctive and equitable monetary relief; and has suffered

anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of

Defendants actions, thereby entitling her to compensatory damages.

132.     Defendants acted with malice or reckless indifference to the rights of the above-

named Asian American thereby entitling her to an award of punitive damages.

133.     To remedy the violations of the rights of Plaintiff secured by Section 1981, Plaintiff

request that the Court award her the relief prayed for above.


## PRAYER FOR RELIEF


**WHEREFORE**, Plaintiff seeks a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited
   by Title VII, by discriminating and retaliating against Plaintiff as a result of her
   protected statuses and activities.

B. Making Plaintiff "whole" for any losses suffered as a result of such unlawful
   employment practices;

C.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation;

D.  Awarding Plaintiff attorney's fees, costs and expenses incurred in the prosecution of the action;

E.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper, to remedy Defendants' unlawful employment practices.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff demands a trial jury.

Dated: April 30, 2018
       Westbury, New York

                 JONATHAN A. TAND & ASSOCIATES, P.C.

                 *John C. Luke, Jr.*
                 John C. Luke, Jr.
                   *Attorneys for Plaintiff*