UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Dr. WEN-TING ZHENG-SMITH,

                Plaintiff,

-against-

NASSAU HEALTH CARE CORPORATION,
DR. VICTOR POLITI, and DR. JOHN RIGGS,

                Defendants.

**MEMORANDUM & ORDER**
18-CV-2585 (NGG) (RLM)

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Dr. Wen-Ting Zheng-Smith brings this action against Defendants Nassau Healthcare Corporation d/b/a NUHealth System, Dr. Victor Politi ("Dr. Politi"), and Dr. John Riggs ("Dr. Riggs") (collectively, "Defendants"), following the termination of her residency in the Department of Obstetrics and Gynecology (the "Department") at Nassau University Medical Center ("NUMC"), operated by Defendant NUHealth System. Specifically, Plaintiff asserts claims for: (1) race and national origin discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL") as codified at N.Y. Exec. Law § 296, and 42 U.S.C. § 1981; (2) causing a hostile work environment in violation of Title VII and NYSHRL; (3) retaliation against Plaintiff under Title VII, NYSHRL, and Section 1981; and (4) aiding, abetting, inciting, compelling, or coercing discriminatory acts, under NYSHRL. Now before the court is Defendants' motion for summary judgment. (*See* Mem. in Supp. of Defs. Mot. for Summ. J. ("Mem.") (Dkt. 34); Pl. Mem. in Opp. to Mot. For Summ. J. ("Opp.") (Dkt. 37); Defs.' Reply (Dkt. 38).) For the reasons that follow, Defendants' motion is GRANTED with prejudice.

## I. BACKGROUND[1]

### A. Plaintiff's Employment and Termination from NUMC

Plaintiff was born and educated in China where she received her initial medical training. (Tr. of Dec. 1, 2017 Def. Dr. Riggs ("Riggs Tr.") (Dkt. 32-3) at 16:18-24.) She immigrated to the United States and worked for five years at Mount Sinai Hospital where she was an embryologist. (*Id.* at 17:2-3.) In June 2015, Plaintiff began her residency as a first-year ("PGY-1") at Jamaica Hospital Medical Center, after which she transferred to NUMC and began work as a second-year resident ("PGY-2") in the Department of Obstetrics and Gynecology ("OB/GYN"). (Pl. Resp. to Defs. Local R. 56.1 Statement ("56.1 Resp.") (Dkt. 35) ¶ 5.)

On March 1, 2016, Dr. Alan Garely, Chair of OB/GYN at South Nassau Communities Hospital, where Plaintiff was completing a rotation, wrote a letter to Dr. Maggie Tetrokalashvili, OB/GYN Program Director at NUMC, regarding Plaintiff's performance. (Dr. Alan Garely Letter of March 1, 2016 ("Garely Letter") (Dkt. 32-7).) Dr. Tetrokalashvili shared the letter with Dr. Riggs, Chair of NUMC's OB/GYN department. (56.1 Resp. ¶ 17; Riggs Tr. at 9:12-17.) Dr. Garely recommended that Plaintiff "be immediately removed from her rotation" because "[s]he is unsafe and

---

[1] The court constructs the following statement of facts from the parties' Local Rule 56.1 Statements and the admissible evidence they submitted. Except where otherwise noted, the following facts are undisputed. Where the parties allege different facts, the court notes the dispute and credits the Plaintiff's version if it is supported by evidence in the record. All evidence is construed in the light most favorable to the non-moving party with all "reasonable inferences" drawn in its favor. *ING Bank N.V. v. M/V Temara, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).

will harm women." (Garely Letter at 1.) Citing specific instances, Dr. Garely stated, among other things, that:

> She can't prioritize duties . . . She can't be trusted at sign outs . . . She can't be trusted ever . . . She is nasty to the nurses and refuses to see patients when called . . . She is frequently missing for hours and nobody knows where she is. She cannot formulate treatment plans and implement them. She lacks insight into her shortcomings and doesn't seem to understand why she is being criticized. There is not one nurse or physician who would choose to work with her.

(*Id.*) Dr. Garely also included comments from other members of his department, including that Plaintiff was "[t]he worst resident I've ever encountered"; that she displayed "consistent unprofessionalism and dereliction of duties"; and that "she should not be trusted with the care of any woman." (*Id.* at 1-5.)

Soon after, Dr. Riggs and other members of the Department met with Plaintiff to discuss her performance during the rotation at South Nassau. (56.1 Resp. ¶ 27.) Plaintiff expressed that she felt her biggest weaknesses were her communication skills and language and culture barriers. (*Id.*) Plaintiff was given a new mentor, Dr. Lennox Bryson, and placed on a remediation plan. (*Id.* ¶ 28.) She also sent an email to Dr. Garely and other South Nassau staff members, apologizing for her misconduct and inappropriate behavior. (*Id.* ¶ 31.)[2] Plaintiff successfully completed the initial remediation on July 5, 2016. (Outcome of Pl. Remediation Plan of July 5, 2016 (Dkt. 36-8).)

On August 31, 2016, a medical assistant in NUMC's ambulatory clinic observed Plaintiff use profane language when inserting a

---

[2] Although it is undisputed that Plaintiff sent this email, Plaintiff argues that her apology was not sincere. (56.1 Resp. ¶ 31.) She claims that Dr. Riggs "forced [her] to apologize in writing for non-existing medical 'errors' and non existing 'wrongdoings'". (Aff. of Dr. Zheng-Smith (Dkt. 36-7) ¶ 9.)

3

speculum into a patient. (56.1 Resp. ¶ 35.)[3] When the patient seemed uncomfortable, Plaintiff told her to think about something that made her happy, to which the patient responded that she had recently been on vacation. (Riggs Tr. at 21:23- 22:3.) Plaintiff responded, "Oh, you can afford to go on a vacation? I can't." The patient then began to cry. (*Id.*)[4] The following day, Plaintiff spoke with Dr. Tetrokalashvili and confirmed the story. (Riggs Tr. at 22:12-15.) Dr. Riggs, in consultation with other hospital staff, decided to place Plaintiff on a second remediation, beginning on October 6, 2016. (56.1 Resp. ¶ 37.)

On November 15, 2016, a labor and delivery nurse reported to Dr. Riggs and Department leadership that Plaintiff failed to properly clamp a baby's umbilical cord during an uncomplicated vaginal delivery, which could have caused danger to the baby and mother. (56.1 Resp. ¶ 38.) Plaintiff disputes that any malpractice occurred. (*Id.*) However, Plaintiff admits that instead of reporting the incident to her attending-in-charge along the chain of command—a subject on which she was instructed during her first remediation (56.1 Resp. ¶ 34)—Plaintiff went directly to the patient "to investigate" and to "set the record straight". (*Id.* ¶ 39.) A few days later, Plaintiff was assisting with a C-Section when she allegedly handed a knife to the scrub nurse improperly, causing the nurse to cut her finger. (*Id.* ¶ 40.)

Dr. Riggs met with Dr. Tetrokalashvili and other members of the Department to discuss Plaintiff's performance. (*Id.* ¶ 41.) The group decided that Plaintiff would be placed on institutional probation for three months, effective January 6, 2017, due to her

---

[3] Plaintiff disputes using profanity and insists that she told the patient that the speculum was "no bigger than a cork." (56.1 Resp. ¶ 35.)

[4] Plaintiff claims that her comment about not being able to afford a vacation was a joke. (Riggs Tr. at 24:6-7.)

clinical issues, unprofessionalism, and history of prior remediations. (*Id.*) At the beginning of the probationary period, Plaintiff attended a meeting with Dr. Riggs, Dr. Tetrokalashvili, and others, who reviewed her record and provided her with feedback. (Id. ¶ 42.) At the meeting, Dr. Bryson, Plaintiff's assigned mentor, commented that her "lack of judgment is not safe, and patients may die if she continues what she's doing." (Riggs Tr. at 33:20-34:2.) Plaintiff stated that she felt she would not be able to complete the probationary period and felt her problem was simply language and communication skills. (56.1 Resp. ¶ 42.) Plaintiff refused to sign the probation document. (Id. ¶ 43.)

On February 3, 2017, Plaintiff emailed Dr. Bryson and Dr. Tetrokalashvili after an incident that occurred during a rotation at Memorial Sloan Kettering Cancer Center (Pl. Feb. 3, 2017 E-mail (Dkt. 32-9).) Plaintiff apologized for giving an incorrect dose of medicine to a patient that could have caused renal damage, especially considering the patient's medical history. She concluded that:

> I felt very bad for the incident from that moment on, and I did learn very well from this case that I need to be extremely careful and double check with my supervisor regarding the treatment plan, necessity and dosage of a medication in a scenario that I am not familiar with before I make any decision or give prescriptions to the patient.

(*Id.*) Plaintiff received mostly "barely satisfactory" evaluations from her rotation at Memorial Sloan Kettering. (Riggs Tr. at 32:15-22.)

Later that month, Plaintiff attended a follow-up meeting with Dr. Bryson and Dr. Tetrokalashvili, where she was told that "the faculty and chief resident observed her and find her insubordinate. She doesn't listen. She's just focused on what she wants to do. Doesn't accept feedback. Not following directions." (56.1 Resp. ¶ 45.) The chief resident, Dr. Emma Hackett stated, "Dr. Zheng-

5

Smith was missing on educational rounds. She was told to put orders and follow through, and she doesn't. The residents don't feel that they can even trust her, and she's not at the level she should be." (*Id.*)

On March 17, 2017, the faculty informed Plaintiff that she was not prepared to move forward as scheduled to become a PGY-4 chief resident. (*Id.* ¶ 46.) Then, at a follow-up meeting, the faculty presented to Plaintiff a plan to provide her with additional medical, leadership, and communications training during the three extra months she was to spend as a PGY-3. (*Id.*¶ 48.) Towards the end of the three-month period, chief resident Dr. Aries Kuo reported that Plaintiff was "more of a burden on the whole team compared to the other PGY-3 residents", and her PGY-3 residency status was extended for another six months. (*Id.* ¶¶ 49-50.)

In September 2017, Department members met with Plaintiff to discuss her unexcused and unreported absences from work over the prior week, following the extension of her PGY-3 residency status. (*Id.* ¶ 52.) On October 3, 2017, Dr. Riggs confronted Plaintiff over reports that she had been using her cell phone to take audio recordings of physicians and patients in the clinic without their knowledge, putting patients' protected health information at risk. (*Id.* ¶ 53; Riggs Tr. at 49:6-24.) Plaintiff refused to respond to the allegation and she was suspended pending an investigation. (56.1 Resp. ¶ 53.) After a week-long investigation, the Department voted unanimously to terminate Plaintiff from her position. (*Id.* ¶ 54). Before the conclusion of the investigation and the vote, Plaintiff forwarded a notice of appeal to the CEO of NUMC, Dr. Politi. On October 23, 2017, NUMC's counsel informed Plaintiff that her request for an appeal of her suspension and termination were reviewed by NUMC's President and were denied. (NUMC Oct. 23, 2017 Appeal Letter (Dkt. 32-6).)

Plaintiff then requested a formal hearing pursuant to NUMC's Academic Affairs Policy. The hearing took place on December 1, 2017. (Tr. of Dec. 1, 2017 Proceeding (Dkt. 32-3).) Plaintiff had an opportunity to bring witnesses but did not. Three doctors appeared as witnesses on behalf of the OB/GYN Department. (*Id.*) The panel voted unanimously to uphold Plaintiff's termination. (56.1 Resp. ¶ 59.)

### B.  Alleged Discrimination, Hostile Work Environment, and Retaliation

Plaintiff maintains that she was subject to discrimination as a Chinese immigrant and to a hostile work environment. Specifically, she alleges that Dr. Riggs disparaged her accent and oral communication abilities on multiple occasions:

- On July 13 and August 10, 2016, Dr. Riggs asked Dr. Bryson to "translate" what Plaintiff was saying, as she presented patient cases in English. (Compl. (Dkt. 1) ¶ 40.)
- On January 6, 2017, Dr. Riggs "ridiculed and mocked" Plaintiff's accent during a meeting. (*Id.* ¶ 47.) Plaintiff avers that Dr. Riggs routinely complained about her accent in meetings. (*Id.* ¶ 45.)
- On February 16, 2017, Dr. Riggs complained that Plaintiff was speaking too quickly and that he could not understand her due to her accent. He required that she present "repetitively" in order to be more clear, which caused the meeting to last approximately 45 minutes, about twice its normal length. (*Id.* ¶ 50.) The following day, at the same meeting, Dr. Riggs stopped Plaintiff's presentation after two minutes because she was speaking too slowly and giving too much detail. Dr. Riggs then abandoned the meeting. (*Id.* ¶ 51.)

Defendants deny the allegations related to those specific instances. (Defs.' Ans. (Dkt. 13) ¶¶ 40, 45, 47, 50, 51.) Plaintiff

7

alleges that she complained to an attending physician about how Dr. Riggs treated her and that the attending physician noted that another colleague had commented that Dr. Riggs's behavior towards Plaintiff was "just too much". (Compl. ¶¶ 48-49.) Plaintiff also claims to have stated at an OB/GYN Department meeting in November 2016 that she was "a small immigrated [sic] Chinese woman who was an easy target to be picked on by prejudice people." (Id. ¶ 43.) In addition to her allegations of specific misconduct by Dr. Riggs, Plaintiff argues that she was treated inequitably in comparison with other residents who were not Chinese immigrants. (Compl. ¶¶ 53-58.) She states that several residents who scored lower than the 25th percentile on the Council on Resident Education in Obstetrics and Gynecology ("CREOG") Exam in January 2017 were not given remediation plans while she, who maintained the best CREOG score in her class for three straight years, was. (Id. ¶¶ 69-70). Defendants deny that claim, including Plaintiff's claims about her CREOG scores. (Ans. ¶ 70.)

Plaintiff claims that a number of adverse employment actions were the result of discrimination against her and in retaliation against her for reporting that discrimination. She alleges that she was demoted from leadership training when she was held at PGY-3 status while her co-residents progressed to PGY-4 status (Id. ¶ 54); that she was supervised by residents more junior than she (Id. ¶ 55); that she was prevented from engaging in surgical training (Id. ¶ 56); that she was kept out of specialized clinics and senior roles (Id. ¶ 58); that she was improperly placed and kept on institutional probation and remediation plans (Id. ¶¶ 63-68; 71-79); and finally that she was wrongfully terminated, in a process not compliant with NUMC's policies and procedures (Id. ¶¶ 89-100).

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on November 1, 2017. (EEOC

Compl. (Dkt. 32-11).) She filed a complaint with the New York State Division of Human Rights on January 16, 2018. (NYSDHR Compl. (Dkt. 32-10).) On February 1, 2018, Plaintiff received a Right to Sue Letter from the EEOC. (Compl. ¶ 7.) She filed her complaint before the court on May 1, 2018. (Compl.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this [c]ourt will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).[5] "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant may discharge its initial burden by demonstrating that the non-movant "has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 225 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986)).

---

[5] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

While the court must draw all inferences in favor of the non-movant, the non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Finally, in considering the movant Defendants' motion, the court is mindful that the Second Circuit "has long recognized the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016). Nevertheless, "[t]hough caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).

## III. DISCUSSION

Because Plaintiff alleges overlapping factual claims that constitute violations of multiple federal and state statutes, the court organizes its analysis by theory of discrimination.

### A. Race and National Origin Discrimination

Claims for race and national origin discrimination under Title VII, NYSHRL, and 42 U.S.C. §1981 are all analyzed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Walsh*, 828 F.3d at 74-75 (applying framework to Title VII and NYSHRL); *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir. 1999) (applying framework to § 1981). Under that familiar test, a plaintiff must first make out a prima facie case by showing that: (1) she is a member of a protected class; (2) she was qualified for and satisfactorily performing her job; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action raise an inference of discrimination.

*McDonnell Douglas,* 411 U.S. at 802. Once a plaintiff makes a prima facie showing, "discriminatory animus is presumed and the burden shifts to defendant to articulate a legitimate non-discriminatory reason for the employment decision. If defendant does so, the plaintiff must show that the articulated non-discriminatory reason for defendant's action is in fact a pretext for discrimination." *Jetter v. Knothe Corp.*, 324 F.3d 73, 75 (2d Cir. 2003). To successfully rebut a defendant's non-discriminatory rationale, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).

### 1. Plaintiff's Prima Facie Case

Plaintiff is a member of a protected class who suffered adverse employment actions. Whether she can make a prima facie case of discrimination therefore turns on whether she was "satisfactorily performing her job." *See Mauze v. CBS Corporation*, 340 F. Supp. 3d 186, 207 (E.D.N.Y. 2018), *recons. on other grounds and aff'd* 15-cv-4905 (RJD), 2019 WL 8137641 (E.D.N.Y. Jan. 23, 2019). The requirements for a prima facie showing are "minimal". *James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Still, where an employee's behaviors were "unprofessional, disruptive, [or] impeded [] colleagues' abilities to complete urgent tasks", a court may find that the employee fails to clear even the low bar required to shift the burden to the defendant employer. *Mauze* 340 F. Supp. 3d at 208.

Here, Plaintiff has failed to make a prima facie case because she has failed to show that she satisfactorily performed the duties of her job. Over the course of 18 months, medical personnel at three different health care facilities observed Plaintiff's job performance and found that she was "unsafe and will harm women"; that "her lack of judgment is not safe and patients may die if she

11

continues what she's doing"; and that "she is a danger to her patients". (Defs. 56.1 ¶¶ 17, 44, 22.) Plaintiff was consistently evaluated as "unprofessional". (*Id.* ¶¶ 19, 41.) She had multiple unexcused absences from work. (*Id.* ¶ 52). Despite specific training and remediation on the importance of following proper internal reporting channels within the hospital, Plaintiff disregarded them. (*Id.* ¶ 39.) In the context of medical care, the inability to work appropriately with supervisors can put patients at risk, as Plaintiff acknowledged in an email she sent after she failed to follow a supervisor's treatment plan and administered a dosage of medicine to a patient that could have caused long term renal damage. (Pl. Feb. 3, 2017 Email.)

Plaintiff points to a May 7, 2017 evaluation, on which she scored "satisfactory" or better in 18 of 28 categories, as evidence that she performed her job satisfactorily. (56.1 Resp. ¶ 10.) However, the court considers that evaluation in context, along with other performance evaluations over time. *Williams v. Alliance Nat'l Inc.*, No. 98-cv-7984 (RCC), 2001 WL 274107 at *5 (S.D.N.Y. March 19, 2001). Accordingly, the court declines to ascribe more weight to one middling evaluation than to 18 months' worth of consistently negative and alarming feedback about Plaintiff's job performance, including formal evaluations in which she was rated as "Poor" in the areas of Professional Judgment, Ethical Conduct, and Cooperativeness. (56.1 ¶ 10.) Similarly, the fact that Plaintiff was promoted from PGY-2 to PGY-3 cannot alone demonstrate satisfactory job performance considering the feedback she received along the way, her numerous remediations for poor performance, and the faculty's decision not to promote her from PGY-3 to PGY-4 along with the rest of her cohort.

Equally unavailing is Plaintiff's attempt to establish discrimination on the basis of disparate treatment. "A showing of disparate treatment—that is, a showing that an employer treated plaintiff

12

less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010). To establish disparate treatment, there must be a reasonably close resemblance of the facts and circumstances of a plaintiff's and a comparator's cases, such that the comparator "must be similarly situated to the plaintiff in all material respects." *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 21 (2d Cir. 2013). Although the two positions need not be identical, they must be "sufficiently similar" to support "at least a minimal inference that the difference in treatment may be attributable to discrimination." *Cutler v. Stop & Shop Supermarket Co., LLC.*, 513 F. App'x 81, 83 (2d Cir. 2013). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Abdul-Hakeem*, 523 F. App'x at 21.

Plaintiff argues, *inter alia*, that she was assigned to fewer surgical cases than her co-residents, prevented from participating in specialty clinics, and placed and kept on institutional probation and remediation plans when others were not. (Compl. ¶¶ 56, 58, 67.) But Plaintiff offers no similarly situated comparator to substantiate her claim. Instead, she offers Dr. Rachel Chamberlain, another intern accused of making an audio recording of a resident while on shift. (Notes of June 13, 2017 Mtg. (Dkt. 36-10).) According to Plaintiff, Dr. Chamberlain, who is white, was given a three-month remediation whereas Plaintiff was suspended and terminated for the same conduct. (Opp. at 7.) The comparison fails in an obvious respect: there is no allegation that the complaint against Dr. Chamberlain came after a series of interventions for poor performance and concern for the safety of patients placed in her care.

Plaintiff's claims under Title VII, NYSHRL, and Section 1981 therefore fail to get out the gate, because she cannot establish a prima facie case of discrimination.

2. Pretext

Even if Plaintiff made a prima facie showing of discrimination, the copious and contemporaneous documentation of Defendants' concern with her performance and attempts to remediate her is more than sufficient to demonstrate legitimate and non-discriminatory reasons for terminating her employment. *See Tubo v. Orange Reg'l Med. Ctr.*, 690 F. App'x. 736, 740 (2d Cir. 2017). Therefore, the court moves to the third stage of the *McDonnell Douglas* inquiry. At this stage, a plaintiff "may no longer simply rely on having made out a prima facie case" and the court must "determine, by looking at the evidence [the plaintiff] has proffered and the counter-evidence [the defendant] has presented, whether [the plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence" that the alleged discrimination was a motivating factor for the adverse employment action. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010); 42 U.S.C. § 2000e-2(m). "Conclusory allegations of discrimination are insufficient to show that a defendant's non-discriminatory reasons are pretexts and avoid summary judgment." *Trane v. Northrop Grumman Corp.*, 94 F. Supp. 3d 367, 375 (E.D.N.Y. 2015).

Here, Plaintiff alleges disparaging remarks by Dr. Riggs that do not, on their own, suggest that Defendants' proffered legitimate reasons for termination were pretextual. As the court has stated, "stray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination without more." *Parsons v. JP Morgan Chase Bank*, No. 16-cv-0408 (NGG), 2018 WL 4861379, at *11 (E.D.N.Y. Sept. 30, 2018); *see also Kho v. New York & Presbyterian Hosp.*,

344 F. Supp. 3d 705 (S.D.N.Y. 2018) (manager's alleged comments about employee's Chinese accent, including that she needed to speak English, did not demonstrate that non-discriminatory reasons for termination were pretextual). Although Dr. Riggs was Chairman of the OB/GYN Department and ultimately responsible for Plaintiff's termination, the Department voted unanimously to terminate her based on reports from numerous doctors, across multiple institutions. (Defs. 56.1 ¶ 54.) An independent panel unanimously upheld that decision. (*Id.* ¶ 59.) Even if the court assumed animus on the part of Dr. Riggs, and even if the court refused to credit any evaluation or recommendation that he gave, there would still be overwhelming evidence—from people against whom no allegations of discrimination have been made—that Defendants' decision to terminate Plaintiff's employment was based on legitimate non-discriminatory reasons. *See Collins v. New York City Transit Auth.*, 305 F.3d 113, 115 (2d. Cir. 2002) ("Where an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive.")

At this stage in the *McDonnell Douglas* framework, Plaintiff bears the burden to overcome the legitimate and non-discriminatory reasons for termination that Defendants proffered. The comments made by Dr. Riggs are not enough to suggest animus on behalf of over ten doctors, spread across three medical centers, who concluded that her performance on the job was poor and dangerous to patients. Accordingly, Defendants are entitled to summary judgment on all of Plaintiff's claims for race and national origin discrimination under Title VII, NYSHRL, and Section 1981.

### B. Hostile Work Environment

Plaintiff asserts claims for hostile work environment under 42 U.S.C. § 2000e and the NYSHRL. As with discrimination, analyses of hostile work environment claims under federal and New York law are coextensive. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 670 (S.D.N.Y. 2012). Although courts are generally reluctant to grant summary judgment in such matters, "courts use a totality of the circumstances approach for determining whether a plaintiff's work environment is sufficiently hostile to support a hostile work environment claim." *Love v. City of New York Dept. of Consumer Affairs,* 390 F. Supp. 2d 362, 371 (S.D.N.Y. 2005).

A hostile work environment claim requires a showing first that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and second that "a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000). Incidents of harassment must be continuous and not merely episodic. *Gorzynski,* 596 F.3d at 102. In evaluating whether a workplace is hostile, courts consider several factors including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interferes with the employee's work performance. *Terry,* 336 F.3d at 148. As such, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are generally insufficient to sustain a hostile work environment claim. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).

Plaintiff's evidence is insufficient to establish a hostile work environment claim. She alleges that Dr. Riggs mocked or otherwise demeaned her on five specific occasions:

- July 13, 2016: Dr. Riggs asked Dr. Bryson to translate what Plaintiff was saying;
- August 10, 2016: Dr. Riggs asked Dr. Bryson to help him understand Plaintiff;
- January 6, 2017: Dr. Riggs "ridiculed and mocked" Plaintiff's accent;
- February 16, 2017: Dr. Riggs complained that could not understand her and that she was speaking too quickly; and
- February 17, 2017: Dr. Riggs complained that Plaintiff speaking too slowly.

(Compl. ¶¶ 40-51.)

Mocking an individual's accent is inappropriate and may, under certain circumstances, provide a basis for successful claims of discrimination or a hostile work environment. In this case, however, these incidents alone fail to establish an environment "permeated with discrimination, intimidation, ridicule, and insult," as necessary to sustain a hostile work environment claim. *Kho*, 344 F. Supp. 3d at 722. The only alleged instance of direct mocking occurred on January 6, 2017. No reasonable juror could find that Dr. Riggs's comments "were continuous and concerted or constituted a steady barrage of opprobrious comments." *Id.* (holding that manager's comments about employee's Chinese accent were insufficient to show a hostile work environment); *see also Augustin v. Yale Club of N.Y.C.,* No. 03-cv-1924 (KMK), 2006 WL 2690289 (S.D.N.Y. Sept. 15, 2006) (finding that four or five comments over a five-year period are insufficient to support hostile work environment claim). Accordingly, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claims.

## C. Retaliation

Plaintiff also asserts claims for retaliation under Title VII and NYSHRL. "In order to defeat a motion for summary judgment addressed to a claim of retaliation . . . plaintiff must first present sufficient evidence to make out a prima facie case, that is, evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected participation or opposition under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001). The court employs the same analysis for claims under NYSHRL. *Ideyi v. State Univ. of New York Downstate Med. Ctr.*, 09-cv-1490 (ENV), 2010 WL 3938411 at *6 (E.D.N.Y. Sept. 30, 2010).

Plaintiff's claims of retaliation fail for the same reason her claims of discrimination fail. Given the extensive evidence of legitimate, non-discriminatory reasons for Defendants to terminate Plaintiff's residency, no reasonable juror could find that retaliation, rather than performance, drove the decision. *See Emengo v. Stark*, 774 F. App'x 26, 30 (2d Cir. 2019). Defendants are entitled to summary judgment on Plaintiff's claims of retaliation.

## D. Aiding and Abetting

Finally, Plaintiff asserts a claim under NYSHRL insofar as it provides that it is an unlawful discriminatory practice to "aid, abet, incite, compel or coerce" any act forbidden by the statute. N.Y. Exec. Law § 296(6). Because the court now dismisses all of Plaintiff's other claims under NYSHRL, there was no forbidden act to aid or abet and Defendants are entitled to summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' (Dkt. 31) Motion for Summary Judgment is GRANTED with prejudice. The Clerk of the Court is respectfully DIRECTED to enter judgment for Defendants and close the case.

SO ORDERED.

Dated: Brooklyn, New York
September 14, 2020

/s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge